Good morning, Your Honors, and may it please the Court, Aaron Corthuis with the Northwest Immigrant Rights Project on behalf of Mr. Muhamad. I'd like to reserve three minutes of my time for rebuttal. Mr. Muhamad is a refugee from Iraq and a lawful permanent resident of this country who the government claims is removable. But to remove him, the government must meet the most demanding standard applicable in removal proceedings, that of clearing convincing evidence. Specifically, in this case, the government was required to show by clear and convincing evidence that Mr. Muhamad made a knowing, voluntary, and material misrepresentation during his refugee processing. But rather, but in concluding that DHS met that standard in this case, the agency relied on unfounded speculation and unreliable and untested evidence that simply can't meet DHS's burden. Now, at the outset, I want to stress that as a lawful permanent resident of this country, Mr. Muhamad is entitled to a host of protections that don't apply to many other people in removal proceedings. Specifically, Congress has made clear in the INA that the clear and convincing evidence standard applies when the government tries to take someone away from the place that has permanently admitted them in the place that they call their home. Now, that makes Mr. Muhamad unlike so many others that come before this court and those cases in which the petitioner bears the burden of proof. Unlike those cases, Mr. Muhamad, or the government, bears the burden of proof in this case. And not only that, but it bears it by clear and convincing evidence. Now, despite paying lip service to that standard, the agency's conclusion is not supported by clear and convincing evidence. And that's first of all true with respect to whether Mr. Muhamad made a knowing involuntary misrepresentation during his refugee processing in Turkey. Now, the BIA says that Mr. Muhamad misrepresented who formed part of his family because he didn't list the people who lived outside of the home, who didn't live with him. But Mr. Muhamad provided credible and consistent unit, the people that he lived with. And consistent with that explanation, he actually provided his ration card, which listed the people that he lived with, when counsel counsel, I know you said in your briefs, the same thing that he provided consistent testimony in that regard. But on AR 281, and then a couple pages later on AR 285, it seems like the immigration judge asked him, I think actually the maybe it's government counsel and said, but in reality, you actually had a number of other brothers who were not disclosed. Correct. And he said, I informed about them, all of them. He said something similar a few minutes later, a few pages later on the transcript. So it's not really true that he was consistent, right? He started by saying, I disclosed them all. And then I think he switched over to the narrative that you're that any, and he was your honor. I think that Mr. Muhammad there is my understanding of it is that he is saying he provided the information again, that he thought was asked of him. And, and, and I, I would take issue with the fact that he, that he changed his testimony. I mean, Mr. Muhammad actually provided the same explanation early in pro se proceedings before the immigration judge when the removal proceedings weren't happening yet. And then again, throughout the proceedings, he was consistent in his declarations, in his testimony, that's a, our, what do you think he meant on AR two 81? When, you know, they asked him, well, you have these other brothers, right? Correct. And he says, I informed about them, all of them. What I think he means, your honor, is that in that particular instance, that he, he provided again, the information that he thought was asked of him, that's his family unit, the people that were but that's not the question is you have these other brothers, you didn't disclose, correct? And he says, I informed about them, all of them, then actually says, you knew, you knew you had other brothers, correct? Yes, I informed about them. So I don't know, I don't think I can read it that way. Well, your honor, I guess two points with respect to that. First of all, the immigration judge in her decision did, did say that Mr. Muhammad had provided a credible testimony. And she did say that like his explanation was that he understood that his he was only needed to provide information about his family unit. That was certainly the immigration judges understanding. And again, I agree that this is maybe a little bit confusing. But other than this one instance, Mr. Muhammad's testimony was very consistent about that repeatedly throughout the his testimony and also in his declarations also in say, say proceedings before the immigration judge. And not only that, but when that as to the credibility thing, I run into this quite a bit, it seems like in the immigration cases, I agree that the judge found credible, but there you can, you would agree that you can have credible testimony. Which I find the credit adverse credibility thing, it seems that's basically the judge saying you're a liar. And then you use the adverse credibility to say you said things that were wrong here. So I'm going to, I'm going to find that that other stuff you said, I'm not going to believe other stuff you said. But here, you can say, you know, he's a credible witness, but there's still inconsistencies in his testimony and use that to give the person less weight, can't you? Certainly honor you the the testimony can be a judge can decide how to weigh the testimony. But when you have consistent what the immigration judge has deemed consistent testimony, plus what you have here is the which corroborates Mr. Muhammad's account. And I want to stress that point, because the the asylum officer that testified in the proceedings below said that he went typically step by step, question by question, placing a checkmark as he reviewed information. There's no checkmarks by the family information that would have cleared up Mr. Muhammad's misunderstanding about who he needed to put on the application. And the government has never responded to that point either. So let me move to a slightly different point before we beat to death this question of the brothers. And that really goes to what I think is the heart of the case, which relates to the FBI, and what he told the FBI. And I'd like you to respond on two points. One, the the the IJ noted a very distinct change in demeanor and found that he was credible, except on certain points. So there was not a clean bill of health on credibility, and then noted a real shift in demeanor. And I know you attack the use of the FBI testimony, even though there was cross examination, but it seems to me that really goes to the heart of the collision between the parties in this case. So I appreciate your comments on that. Certainly, Your Honor. First of all, as we argued in our brief, it doesn't form a specific and cogent basis to find Mr. Muhammad not credible with respect to this one issue when the only reason for that was a reaction to uphold someone else on the stand. And second, this issue of whether Mr. Muhammad was not credible with respect to this one issue only goes to whether he is eligible for a waiver of the alleged misrepresentation he made, because the thing that the IJ found him not credible about doesn't go to whether or not he is removable, because it's not about any of his brothers or anything. It's about an alleged interaction he had with someone else in Iraq. So it doesn't actually go to the question of removability. Now, on that question of removal... What do you think is the relevance then of that finding? Your Honor, I don't actually think it's relevant to resolve this appeal in that because it wasn't necessary for the judge's removability finding in this case. We did challenge it because I realize it can be damning in some ways, but it wasn't and didn't form part of the removability finding in this case, because it went to a separate thing about another interaction and only to whether Mr. Muhammad is eligible for a waiver to the alleged misrepresentation he made. But I want to stress, too, what I... Well, let me ask you that. Let's assume, just for purposes, that there was a misrepresentation, but then you would need a waiver of that. But if this goes to the waiver, and you don't get over the waiver issue, you're back where you started, right? What we've challenged here, Your Honor, is the removability finding and, of course, CAT. We didn't challenge the waiver given the number of issues in the case, but yes, the waiver... In order to be eligible for the waiver, it would be true that Mr. Muhammad would need to overcome the negative finding credibility with respect to that one specific issue. So let me just try to get this straight procedurally. The BIA addressed that, correct? The BIA addressed the credibility finding, that's correct. With respect to this waiver issue? With respect to the waiver issue only, yes. And if the BIA is credited on that point, then doesn't it really make this underlying dispute over the misrepresentation kind of evaporate because you then look to ultimately what the BIA was considering? No, Your Honor, because the government... With respect to the waiver, I believe that Mr. Muhammad would have the burden of proof to show that he's eligible for the waiver. So the negative credibility finding there would count against him significantly. Whereas with respect to whether or not one of his brothers was involved in, quote, terrorism-related activity, the government bears the burden of proof. There's not a negative credibility finding with respect to that issue. And there are many other issues with the government's evidence. Just to briefly highlight... Okay, so I just want to stop you because I'm wanting to make sure I understand your procedural process. So I understand that there's a dispute over the misrepresentation. And either there's clear and convincing evidence or there's not. But even if there were not clear and convincing evidence, you would still need a waiver, correct? If there was not clear and convincing... If there was... Sorry. If there was not clear and convincing evidence as to whether Mr. Muhammad was removable, he remains a lawful permanent resident of the United States. And he would never need the misrepresentation waiver in the first instance.  All right. Counsel, can I... I want to piggyback if that's all right on Judge McEwen's question about the FBI reports. I think that's really important here. And in reading through that, I think you guys did as good a job as you can of discrediting those reports. But at the end of the day, I'm left reading it and wondering, are we supposed to just assume the FBI are a bunch of liars? Because you're basically saying, like, the reports are completely... What's in there is just completely not true. And if that's correct, what was going on there? Are the FBI liars? Or what was he saying to the FBI? That's one thing we don't see anywhere in your briefing, is what he was supposedly saying to the FBI that they misunderstood so badly as to think that his brothers were terrorists, that he had done these bad things, et cetera. Certainly, Your Honor. And can I ask for, I guess, a few additional minutes of time, only because I'd ask for a few minutes of rebuttal. And I know there's a lot going on. I'd like you to answer Judge Van Dyke's question, and then we'll give you a fair amount of time for rebuttal. Certainly. So to answer your question, Judge Van Dyke, I think that we're not saying that the FBI are liars. What we are saying is that Mr. Muhammad, or that there is confusion over what Mr. Muhammad communicated to them, and that the FBI agents themselves very well could have been confused about what was communicated. And that we have never had a chance to adequately test that. And I guess that's true for a couple reasons. First, Mr. Muhammad has never had a good chance to cross-examine the agents that testified against him. He was only allowed to cross-examine one agent with respect to two reports. He wasn't allowed to ask about whether or not Mr. Muhammad might have made other inconsistent statements in other interactions or exonerating statements. He wasn't allowed to ask whether the agents had corroborated any of the things that Mr. Muhammad said. And all of that goes to credibility, impeachment, and the basic purposes that cross-examination serves. So there hasn't been a chance to test the adequacy of the government's evidence, especially when you have these other indicia of unreliability, notably the language barrier between Mr. Muhammad and the agents. And the other inconsistencies that are evident in the reports themselves and that experts have noted. And briefly, just to finish on the cross-examination report, the agency made a clear error of law with respect to that issue. The agency said that Mr. Muhammad's right to cross-examination was limited properly because of an exception at 1229A-8USC-1229A-B4B, when that exception clearly doesn't apply because this is a removal proceeding and not a proceeding in which Mr. Muhammad's seeking admission. Now, finally, and turning briefly to the question of Kat in this case, because I'd be remiss to not... No, I mean, you've answered the question, so let me turn then to Ms. Hennes. Thank you, Your Honor. Good morning, Your Honor. May it please the Court, Stephanie Hennes for Respondent. When Mr. Muhammad applied for refugee status, he was required to identify all of his siblings, but he only did three brothers whom the government has identified as being connected to terrorist organizations. Now, in his removal proceedings, when asked about the questions that he had to respond to about his family, he specifically informed the Court that he was asked about his brothers and sisters or his siblings. Now, opposing counsel has turned this into a question of who his family is made up of, but during his proceeding, his attorney asked him about the refugee officer's questions. And the question was, did the officer ask you how many brothers and sisters you had? And Muhammad replied, he asked me and I answered him. But he answered him with a document, supposedly, that does not actually list all of the siblings. It lists one sibling. Then, in regard to the family tree report, a document that was completed on a different occasion. These were not all done at once. Mr. Muhammad testified that he had three to four interviews about this. He was asked in the forum, they asked you to list your siblings. Isn't that true, sir? And he said, yes, I informed them. And then it went on to say, and you gave them the identification slash ration card because they wanted to know about who your brothers and sisters were. And you provided that document to answer the question. And he said, yes. So this notion that there's consistent testimony that Mr. Muhammad understood the question to be asking about his family generally, or who he lived with, or his household members, is not in line with the testimony that he gave in immigration court. Now, in contrast to what was presented during the petitioner's argument today, the immigration judge did, in fact, reject Mr. Muhammad's contention that he simply misunderstood the question. And the board agreed with that determination, pointing to the fact that Mr. Muhammad never claimed that there were specific questions that he did not understand during those interviews. And again, that lines up with his testimony that he was, in fact, asked about his brothers and sisters or his siblings. And he testified in immigration court at length about his brothers and sisters and had not maintained that brothers and sisters are only one individual who he was living with at the time. And then Mr. Muhammad went on to sign the actual refugee application in which he affirmed the knowledge of the contents of the application and the attachments. The respondent did address the petitioner's argument that the refugee officer did not specifically ask about the members of his family. And I would point again to AR 462 to 64, where his attorney is asking him about the refugee application and asked him about the refugee officer. And that is where he says that the officer asked him how many brothers and sisters he had. And we pointed out in our brief that there's a difference between Mr. Muhammad, who had this one interview on his actual refugee application, and Dr. Helfer, who testified that he performed numerous interviews over the course of his tour as a refugee officer in that area. Moving on to the materiality of the misrepresentation, I'd initially like to push back against the petitioner's argument that there is a Chenery violation that results from relying on the Department of Defense report. In this case, the government is not coming up with a new basis for materiality. The board itself, it's AR 9 of the record, the board says in light of evidence of his brother's terrorism-related activities, we also agree with the immigration judge that the misrepresentation was material. Respondent in this case is simply pointing out evidence in the record that the petitioner sought to suppress that gives evidence that at the time that Mr. Muhammad applied for refugee status, our Department of Defense, the United States government, was aware of his brother's involvement with Ansar al-Sama, which was a foreign terrorist organization. So this also connects with the notion that this is, in fact, a deportability charge, and the government does have the burden to show deportability by clear and convincing evidence. But this is a deportability charge that is based on the petitioner's inadmissibility at the time of his refugee application. Can I ask you about that? I don't remember, and maybe I missed it, but I don't remember necessarily seeing in your brief that you pointed to the FBI reports and the DOD as supporting the IJs and BIAs conclusion that he misrepresented here. But as I think about it, in a murder case, you can say the person had motive, and that is some evidence that you can give to a jury that they may have murdered somebody. And so it seems to me that if we assume that these FBI reports, if we reject the argument that the FBI reports are worthless, and if we accept the DOD report, is it your position or not that they are also evidence that supports the misrepresentation? I know you argue they support the materiality, but do they support the misrepresentation in that it's evidence that a person with this sort of background and family would have a motive to willfully mislead? Is that your position or is it not? Yes, that would be included in our position. And this is the reason why this should all be considered in the context of this Department of Defense report and the FBI reports together, which all show that swirling about was an underlying notion that Mr. Muhammad's brothers were involved in terrorism. And he does, in addition to the DOD report, in two of the FBI interview reports, he does talk about his brother's involvement with terrorism. He never specifically names the brother, but the brother that he listed in his refugee application is not a brother that's been suspected. So that makes sense, I guess. But can I ask you what I think is one of the more challenging parts of your side of this case, which is that reliance on the statute for excluding some of the cross-examination. If you read the statute, the statute is about admission. It's not, it doesn't specifically mention removal. And so what is your, obviously your position is the statute applies also to removal proceedings. Can you explain that, why that is? And I guess specifically, I'm having a little bit of trouble with the text of the statute covering, but the rationale for why the statute exists, it makes sense to me that like, I don't know why any congressman or anybody would say, well, you know, we want to protect government secrets in the admissibility process, but we don't care when we're trying to remove somebody. That doesn't make any sense to me, but there is sort of a textual problem for you guys, for the government, I think here. Well, so the government in its brief did connect the language of the statute to the particular deportability charge that was lodged in this case. And this gets back to my explanation of what a deportability charge is based on and in admissibility is all about. And so the statute text doesn't refer to, um, removability charges. It doesn't say anything about deportability. It talks about national security information in opposition to the alien's admission to the United States. And the information that we're using here is all related to an opposition to the petitioner's admin to the United States. Had petitioner actually closed all of his brothers, we know from officer Telfer's testimony that there is no way the government would have actually granted him refugee status and invited him to this country. So you can view this a little bit as the deportation charges that are based on admissibility basically take us back to what was occurring outside of the United States for someone entering the country. I understand your argument. Go ahead, Judge. I do want to go to the question then of they also challenged the limited cross-examination to these reports and this agent. So even assuming they're admissible under the grounds that you indicate, there's been a challenge to, you know, his inability, meaning the petitioner's inability to look at the underlying statements made by the FBI. What is the government's response to that argument? Initially, this is not a situation where the government produced some report based on external evidence where there was an independent investigation that was made. These reports are summaries of interviews that Mr. Muhammad actually participated in. He should know full well what occurred during those interviews. And some of the things that he wanted Agent Barney to testify to, he was actually able to testify to himself. One of those that he explained that a lot of times he wasn't providing a narrative answer that the FBI was asking what are basically like leading questions that there was a statement and then he'd respond to it. So we do know a little bit about what occurred there. I think the important thing is to remember too that the petitioner does not need to have the perfect, most extensive phishing expedition in terms of the information that he needs in order to mount a quality defense to evidence and to have a fundamentally fair hearing. And in this case, he did have the ability to cross-examine Special Agent Barney, which in the context of government interviews and particularly information relating to national security is pretty significant. In other cases where there has been overseas investigations, I give Bobby Lynch as an example, at least in terms of a statutory violation, this court was fine with there being no individual to testify in court or be subject to cross-examination. Now in this case, Mr. Muhammad was able to cross-examine for 25 pages of the transcript the individual who prepared the two most relevant interview reports that are in the record. When he did that, he was able to get information that was crucial to him about whether an interpreter was present, there were questions about how the FBI agent had compiled information regarding to a VBIED and the petitioner had questioned whether he would have been able to use that type of language. And Agent Barney explained all of that, saying that that was based on the petitioner using the term car bomb, that he was able to act out different maneuvers that were used in creating and detonating car bombs. There were questions about how Special Agent Barney was able to identify that Mr. Muhammad was comfortable with the interpreter eventually, the different indicia that he would look for to determine whether the person he's interviewing actually understands the questions. And in terms of the interpreter that was used, I will point out that the interpreter was a native Arabic speaker. The arguments that the petitioner made about the Iraqi dialect of Arabic, there are other portions of the record, if that's 290 to 291, where he points out that he listened to the news and watched movies in standard Arabic. He did not need it to be translated into Iraqi Arabic in order to understand. And the interpreter did have the highest level of proficiency in the Arabic language. I also point to the fact that there is a consistent story being told in these FBI reports. While there are efforts to clarify what Muhammad was telling the FBI agents, that shows the FBI agents were doing their job and were trying to get to the correct result. In the end, the clarifying interview where they determined that petitioner's cousin, Salah, is a high level or was a high level operative for ISIS, leading chemical warfare, he ultimately says that his cousin, then a leader in the military in Iraq, also confirms that it's his cousin. There is definitely a consistent story of Muhammad having family members and being a refugee. And I see that I am out of time, so I would request that the court deny the petition for review, because if Mr. Muhammad had in fact listed all of his siblings on his refugee application, the United States government would not have permitted him to enter our country. Thank you. Thank you. Mr. Berbner, would you put two minutes on the clock for rebuttal, please? Thank you, Your Honor. Briefly, with respect to the Department of Defense document, I think the record makes clear that the agency didn't rely on that in the materiality determination. Mr. Muhammad also contested its admission below. That's at AR, or the IJ didn't rely on it. That's clear from 1960 to 61 of the record. The BIA didn't rely on it, 7 and 9 of the record. And Mr. Muhammad did object to it below. That's at 7 and 9 of the record. That's at 1356 of the record and 315 of the record. With respect to Judge Van Dyke's question about national security information and removability proceedings, I just want to point the court to 8 U.S.C. Section 1534, which does provide for specialized proceedings when there are national security concerns, classified information, or for removal proceedings. So the government, in this case, chose to seek to remove Mr. Muhammad under the regular removal proceedings. And as a result, Mr. Muhammad has a right to cross-examination, as the statute provides. Finally, I briefly want to discuss CAAT. And the agency made a clear error of law by denying or by failing to consider the evidence that if removed, Mr. Muhammad will face torture because Iraqi intelligence already knows about Mr. Muhammad. He didn't raise that argument that you're about to talk about in front of the – he raised other ones, but he didn't raise that argument in front of the IJ. He did arguably say one sentence in passing in front of the BIA, but neither the IJ or the BIA addressed it. He didn't raise it in front of the IJ, as best as I could tell looking through the record. He said he was going to be tortured by ISIS, not by the Iraqi government. So I don't know how we can – I don't know how we can address it, and I don't know how he didn't waive it. He did address it, Your Honor. That's – in his brief at 78 to 79, DHS, of course, presented the evidence with respect to the fact that they talked to Asayesh, the Iraqi intelligence agency. His expert at 575 to 76 of the record made clear that he would face torture on this very issue if removed. And in his declaration at 1125, he also made the – said that he would face torture for this very reason if removed. I see that I'm out of time, so in sum, the agency has not met its demanding burden as to whether Mr. Muhammad is removable, and the agency's own evidence shows that Mr. Muhammad will face torture from Iraqi intelligence, Asayesh. Let me just ask you, just so I understand, you're saying that the focus in the BIA's decision on ISIS is mutually exclusive from the Iraqi government, and it's not clear that the BIA considered the potential with respect to the Iraqi government. Is that your argument? Our argument is that the BIA made an error of law by concluding that it was unlikely that anyone in Iraq would find out about Mr. Muhammad's suspected ties to terrorism because, in fact, DHS's own evidence shows that the Iraqi intelligence, who has a demonstrated record of torturing individuals in this very situation where there's suspected ties to terrorism, it shows that he, in fact – that Iraqi intelligence knows of this. So, our argument is that the BIA made a clear error of law by saying it's unlikely that anyone is going to actually find out about this because DHS's – Thank you. I think we have your point in mind. I'd like to thank both counsel for your argument. The case of Muhammad versus Barr is submitted.
judges: McKeown, Caldwell, Vandyke